**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE | No.  51468-1-II |
| Respondent, | |
| v. | |
| ADVANCED H2O, LLC, | PUBLISHED OPINION |
| Appellant. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE | (Consolidated with No.  51513-0-II) |
| Respondent, | |
| v. | |
| TYSON FRESH MEATS INC., | |
| Appellant. | |

CRUSER, J.  —  The Department of Revenue (DOR) appeals the Board of Tax Appeals'

(Board) orders granting summary judgment to Tyson Fresh Meats Inc. (Tyson) and Advanced H2O

LLC (H2O); Tyson and H2O appeal the superior court's reversal of the Board's orders.[1]  DOR

---

[1] General Order 2010–1 of Division II, *In Re: Modified Procedures For Appeals Under The Administrative Procedures Act, Chapter 34.05, and Appeals Under the Land Use Petition Act, Chapter 36.70C RCW* (Wash. Ct. App.), available at http://www.courts.wa.gov/ appellate—trial—courts/, requires that the party filing an appeal in superior court, here DOR, shall have the responsibility for the opening and reply briefs before our court and shall be entitled to open and conclude oral argument, whether designated as the appellant or respondent on appeal to this court.

contends that the Board erred when ruling that Tyson's and H2O's rental payments for the use of pallets are exempt from the retail sales or use tax under RCW 82.04.050(4)(b) because Tyson and H2O did not sublease the pallets to their customers or lease the pallets for the purpose of sublease to their customers and because the leases of pallets were not a lease of "packing materials" under WAC 458-20-115(3)(a) (Rule 115). Tyson and H2O contend that the Board did not err when ruling that their lease transactions are exempt from the retail sales tax under RCW 82.04.050(4)(b) because they leased the pallets for the purpose of subleasing the pallets to their customers and their leases of the pallets were leases of "packing materials" within the meaning of Rule 115(3)(a).

We agree with DOR and hold that Tyson's and H2O's lease transactions are not exempt from the retail sales and the use tax under RCW 82.04.050(4)(b) and are therefore subject to the retail sales and use tax. Accordingly, we reverse the Board and affirm the superior court.

## FACTS

### I. BACKGROUND FACTS

The following facts are undisputed. Tyson is a beef manufacturing corporation that processes and sells meat in Washington. H2O is a corporation that manufactures and sells bottled water and other beverages in Washington. During the years at issue, Tyson and H2O packed their products onto wooden pallets—portable platforms for transporting freight—to facilitate the delivery of their products to their customers.

Tyson and H2O leased wooden pallets from CHEP USA (CHEP), a company that operates a pallet pooling service. CHEP issues, collects, conditions, and reissues pallets, which help companies like Tyson and H2O streamline distribution and transportation of their products to

others.  Each CHEP pallet is identifiable by a CHEP logo and the words "Property of CHEP" or "Owned by CHEP."  H2O Clerk's Papers (CP) at 28.

Tyson and H2O signed a "Hire Agreement" with CHEP to enter into CHEP's pallet pooling service.  The agreement states that CHEP retains ownership and legal title of the pallets at all times:

**6.  OWNERSHIP OF EQUIPMENT**
(a)     CHEP never sells or transfers ownership of its Equipment.  Customer acknowledges and agrees that each item of Equipment has a special value to CHEP and that CHEP repairs, maintains, handles, and otherwise administers the circulation of all Equipment as part of a pool.
(b)     Customer acknowledges and agrees that despite any other clause in the Agreement, CHEP remains the owner of the Equipment at all times.  Neither customer nor any other person is entitled to purchase or sell the Equipment, or use, dispose, or otherwise deal with Equipment in any way that is inconsistent with CHEP's ownership of the Equipment or the terms of this Agreement.  Payment of the Lost Equipment Fee or any other circumstance or event does not constitute or result in any transfer of any property right or other interest in the Equipment by or from CHEP.

H2O Administrative Record (AR) at 121.  The agreement also states that customers may not "assign" their rights under the agreement without CHEP's written consent.  Tyson AR at 113.  Invoices to CHEP customers repeat the Hire Agreement, stating that CHEP is the exclusive owner and that the payment of any fee does not result in "any transfer of any property right or other interest in any CHEP Equipment by or from CHEP."  *Id.* at 134.

As part of the Hire Agreement, CHEP customers agree to accept transfers from other CHEP customers.  When customers ship their products on pallets to distributors or retailers who were also customers of CHEP, the receiving party is required to notify CHEP as to the quantity received and the location of the pallets.  Once a customer accepts a transfer of pallets, the pallets become subject to the receiving customer's contract with CHEP.  CHEP then deducts the transferred pallets

3

from the delivering customer's quantity of pallets "on Hire" or quantity of pallets in its possession.[2] H2O AR at 120.

The Hire Agreement strictly prohibits transfers of pallets to "unauthorized locations," which include transfers to nonparticipating parties or parties that did not have a separate agreement with CHEP. Tyson AR at 99. Customers may transfer pallets to only "authorized locations," which include CHEP's distribution centers or other CHEP customers. *Id.* If a customer transfers pallets to a nonparticipating party, CHEP charges the customer with a "Lost" fee and a "Surcharge." H2O AR at 121, 127. However, if the customer obtains written consent from CHEP to make a transfer to an unauthorized party, CHEP only charges a surcharge and not the lost fee.[3] Conversely, if a customer ships their products using CHEP pallets to another CHEP customer, the customer does not incur a surcharge upon delivery.

---

[2] The relevant contract language is as follows:

> Definition of "QUANTITY OF EQUIPMENT ON RENTAL." For any given day, the Quantity of Equipment on Rental will be calculated by subtracting the quantity of pallets returned to CHEP, or transferred to an authorized location, from the quantity of Equipment shipped to the Customer before that day.
> . . . .
> 5.6 As of the date of transfer of Equipment, the Quantity of Equipment on Rental will increase at the authorized location and will decrease the Quantity of Equipment on Rental at the Customer by the quantity transferred.

Tyson AR at 99.

[3] Both H2O and Tyson's Hire Agreements contain these terms. However, Tyson's agreement states that CHEP will waive the surcharge and provide discounts on Tyson's pallet rental fees if the nonparticipating party signs an agreement with CHEP to enter the pooling service. The lost fee still applied to Tyson in the event that more than .5 percent of the total quantity of CHEP pallets issued to Tyson are unaccounted for upon completion of a periodic inventory check.

On a weekly basis, CHEP charges each customer for use of the pallets by multiplying the number of pallets used by the number of rental days the pallets were in the customer's possession during the billing cycle. CHEP also charges an "Issue Fee" for each pallet the customer receives from CHEP. Tyson CP at 49. Once the customer pays the issue fee, it has the right to keep the pallet in its possession as long as the Hire Agreement is in place.

Tyson and H2O did not provide its customers with an itemized bill charge related to the CHEP pallets when the customers received deliveries of their products. Instead, Tyson "pass[ed] the cost of the pallet rental to the customer in either the freight charge or in the product cost." Tyson AR at 155. H2O's pallet costs are "factored into the amounts it charges customers" for its products. H2O AR at 24.

## II. PROCEDURAL HISTORY: TYSON

DOR audited Tyson for the period of January 1, 2007 through December 31, 2010. DOR assessed Tyson with a $142,691.01 use tax on the pallets Tyson leased from CHEP. Tyson unsuccessfully appealed the tax to DOR's Appeals Division.

Tyson appealed to the Board. Tyson and DOR filed cross motions for summary judgment. Tyson argued that its lease of pallets from CHEP are excluded from the definition of "retail sale" in RCW 82.04.050(1)(a)(i) because Tyson leased the pallets from CHEP for the purpose of subleasing the pallets to its customers and that Tyson's lease of the pallets was a lease of "packing materials" within Rule 115.

The Board granted Tyson's motion for summary judgment. The Board concluded that the rental fees Tyson paid to CHEP were exempt from the retail sales or use taxes as a lease for sublease under RCW 82.04.050(4)(b). The Board further concluded that Tyson's lease of the

pallets qualified as a "lease of 'packing materials' for sublease to its customers" under Rule 115(2), (3)(a), and (6)(c). Tyson AR at 28.

DOR petitioned for judicial review of the Board's decision. The superior court reversed the Board, ruling that Tyson's pallet lease did not qualify as a "'rental for the purpose of sublease or subrent'" within RCW 82.04.050(4)(b) and the lease transactions were not exempt from the sales or use taxes as "'packing materials'" under Rule 115. Tyson CP at 91.

Tyson appeals the superior court's reversal of the Board's decision.

### III.  PROCEDURAL HISTORY:  H2O

DOR assessed H2O with $327,720 in retail sales tax on pallet rental fees from January 1, 2008 through December 31, 2011. H2O requested a refund, arguing that its lease transactions are exempt from the retail sales or use tax because the pallets qualified as nonreturnable "packing materials" under Rule 115.

DOR denied H2O's request. H2O moved for reconsideration, arguing that its lease qualifies as a lease for sublease and is exempt from the retail sales and use tax under RCW 82.04.050(4)(b). DOR denied H2O's motion for reconsideration.

After unsuccessfully appealing to DOR's Appeals Division, H2O appealed the assessment to the Board. At the Board, both parties filed cross motions for summary judgment. H2O argued that the lease payments are exempt from the retail sales and use tax as a lease transaction under RCW 82.04.040(3), and as a lease-for-sublease of packing materials under Rule 115. The Board agreed and ruled that H2O's transaction was a lease under RCW 82.04.040(3) for the use of pallets and qualified for the lease-for-sublease exception under RCW 82.04.050(4)(b) and as a lease of packing materials under Rule 115(2), (3)(a), and (6)(c).

DOR petitioned for judicial review of the Board's decision. The superior court reversed the Board, concluding that the Board erred when it determined that the pallet rentals were exempt from the retail sales and use tax under RCW 82.04.050(4)(b) and Rule 115 as sales of nonreturnable "'packing materials.'" H2O CP at 97.

H2O appeals the superior court's reversal of the Board's decision.

## ANALYSIS

DOR contends that the Board erred in ruling that Tyson's and H2O's (the Manufacturers) lease of CHEP pallets qualifies as a sale-for-resale exemption or lease-for-sublease exemption from the retail sales and use tax under RCW 82.04.050(4)(b) because the Manufacturers did not lease the pallets from CHEP for the purpose of a sublease nor did they sublease the pallets to their customers. DOR also argues that the Board erred in ruling that the Manufacturers' lease transactions are exempt from the retail sales tax under RCW 82.04.050(4)(b) as a lease of "packing materials" pursuant to Rule 115. The Manufacturers counter that their lease transactions are exempt from the retail sales tax under RCW 82.04.050(4)(b) because they leased the pallets for the purpose of a sublease and subleased the pallets to their customers. Furthermore, the Manufacturers argue that their lease transactions are tax exempt as leases or sales of "packing materials" within the meaning of Rule 115. We agree with DOR.

### I. STANDARD OF REVIEW

This case presents a review of an order for summary judgment involving statutory interpretation. Washington's Administrative Procedure Act, ch. 34.05 RCW, governs our review of the Board's order for summary judgment. *Steven Klein, Inc. v. Dep't of Revenue*, 183 Wn.2d 889, 895, 357 P.3d 59 (2015). "On appeal, we review the Board's decision, not the superior court,

and our review of the Board's decision is limited to the record before the Board." *Sprint Spectrum, LP v. Dep't of Revenue*, 174 Wn. App. 645, 657, 302 P.3d 1280 (2013). As the party asserting that the Board erred, DOR bears the burden of demonstrating the invalidity of the Board's actions. *Id*. We review the Board's order de novo. *Id.* at 657-58.

On review of an order for summary judgment, we perform the same inquiry as the trial court. *Activate, Inc. v. Dep't of Revenue*, 150 Wn. App. 807, 812, 209 P.3d 524 (2009). A court must grant summary judgment if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "We grant summary judgment only if reasonable persons could reach but one conclusion from all the evidence." *Activate*, 150 Wn. App. at 812.

We review questions of law, including statutory construction, de novo. *Id.* "'The court's fundamental objective in construing a statute is to ascertain and carry out the legislature's intent.'" *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010) (quoting *Arborwood Idaho, L.L.C. v. City of Kennewick*, 151 Wn.2d 359, 367, 89 P.3d 217 (2004)).

Statutory interpretation begins with the statute's plain meaning. *Sprint*, 174 Wn. App. at 658. We discern the plain meaning from the ordinary meaning of the language at issue, the statute's context, related provisions, and the statutory scheme as a whole. *Lake*, 169 Wn.2d at 526. If the statute is unambiguous, we derive the legislature's intent from the plain language and ordinary meaning alone. *Activate*, 150 Wn. App. at 812.

A statute or regulation is ambiguous if it is susceptible to more than one reasonable interpretation. *Seattle FilmWorks, Inc. v. Dep't of Revenue*, 106 Wn. App. 448, 453, 24 P.3d 460 (2001). Generally, a reviewing court construes an ambiguous taxing statute or regulation in the

taxpayer's favor. *Id*. But when the court is interpreting a regulation or statute granting a tax exemption or deduction, the court must construe it "'strictly, though fairly and in keeping with the ordinary meaning of their language, against the taxpayer.'" *Id.* (quoting *Group Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 401-02, 722 P.2d 787 (1986)). As taxation is the "'rule'" and "'exemption is the exception,'" the taxpayer who "'claims an exemption carries the burden of proving [it] qualifies for it.'" *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 296-97, 242 P.3d 810 (2010); *Activate*, 150 Wn. App. at 813 (alteration in original) (quoting *Glen Park Assocs., LLC v. Dep't of Revenue*, 119 Wn. App. 481, 486, 82 P.3d 664 (2003)).

DOR may prescribe regulations to enforce the tax code. Former RCW 82.32.300 (1997). "The rules of statutory construction apply to agency regulations as well as statutes." *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 322, 189 P.3d 28 (2008). We give great deference to the DOR's interpretation of its own regulations; however, DOR's interpretation is not binding on this court. *Dep't of Revenue v. GameStop, Inc.*, 8 Wn. App. 2d 74, 82, 436 P.3d 435, *review denied*, 193 Wn.2d 1026 (2019). We presume that the regulation is valid if it is reasonably consistent with the statute it implements. *Id*.

## II. LEGAL PRINCIPLES

Washington imposes an excise tax known as the "retail sales" tax on the selling price of each retail transaction of tangible goods in the state. RCW 82.08.020(1)(a). The retail sales tax is calculated based on the sales price of the item sold. RCW 82.08.010(1)(a)(i). Under Washington excise tax laws, the term "sale" is any "transfer of the ownership of, title to, or possession of property for a valuable consideration." Former RCW 82.04.040(1) (2004).

9

The retail sales tax is not imposed on a transaction if the transaction is specifically excluded from the definition of a "retail sale" under RCW 82.04.050(1)(a). The statutory definition of a retail sale excludes purchases "for the purpose of resale as tangible personal property in the regular course of business without intervening use by such person." *Id*. This exclusion is commonly referred to as the sale-for-resale exception or the wholesale exception. WAC 458-20- 115(3)(a).

The definition of "retail sale" includes a lease or rental of personal tangible property. RCW 82.04.050(4)(a). The term "lease or rental" is defined as "any transfer of possession or control of tangible personal property for a fixed or indeterminate term for consideration." Former RCW 82.04.040(3)(a) (2004). Because a retail sale includes a retail lease, the sale-for-resale exception from the statutory definition of "retail sale" is extended to a lease for sublease. Therefore, the retail sales tax is not imposed on leases "for the purpose of [sublease] as tangible personal property in the regular course of business without intervening use by such person." RCW 82.04.050(1)(a)(i); RCW 82.08.010(11). Additionally, our legislature expressly extended the definition of a retail sale to exclude "renting or leasing tangible personal property where the lease or rental is for the purpose of sublease or subrent." RCW 82.04.050(4)(b).

WAC 458-20-211(1) (Rule 211), DOR's administrative interpretation of RCW 82.04.050, "explains how persons are taxable who rent or lease tangible personal property" under the retail sales tax. Rule 211[4] states,

> (6) **Retail sales tax.** Persons who rent or lease tangible personal property to users or consumers are required to collect from their lessees the retail sales tax measured by gross income from rentals as of the time the rental payments fall due.
> (a) RCW 82.04.050 excludes from the definition of the term "retail sale," purchases for resale "as tangible personal property." Thus the retail sales tax does not apply upon sales of tangible personal property to persons who purchase the

---

[4] Rule 211 uses the terms "leasing" and "renting" interchangeably. WAC 458-20-211(2)(a).

same *solely for the purpose of renting or leasing such property*. . . . However, the retail sales tax *applies* upon sales to persons who . . . *intend to make some use of the property other than or in addition to renting or leasing*.

WAC 458-20-211(6) (emphasis added).[5]

Within the sale-for-resale exception is the sale of "packing materials." Rule 115(3)(a). DOR's administrative Rule 115 explains that a sale of packing materials is not subject to the retail sales tax if the buyer of the materials "sell[s] tangible personal property contained in or protected by packing materials." Thus, the retail sales tax is not imposed on the initial sale of packing materials because the purpose of that sale is for the resale of the packing materials, which are sold *with* the product. Because a retail sale includes a lease or rental of personal tangible property, the exception under Rule 115 also applies to a lease for sublease. RCW 82.08.010(11); RCW 82.04.050(4)(a).

Washington also imposes a use tax, which is a "companion tax" that applies when a seller has not collected the retail sales tax. RCW 82.12.020(1)(a), (2); *Glen Park*, 119 Wn. App. at 484 n.1. "The use tax's purpose is 'to tax the privilege of using all tangible property within the state on which [the retail] sales tax has not been paid.'" *Activate*, 150 Wn. App. at 814 (quoting *Sacred Heart Med. Ctr. v. Dep't of Revenue*, 88 Wn. App. 632, 638, 946 P.2d 409 (1997)). The use tax statute incorporates by reference chapters 82.04 and 82.08 RCW. RCW 82.12.010(1); *Activate*,

---

[5] The Manufacturers argue that Rule 211 does not apply in this case because the rule interprets only the sale-for-resale exception under RCW 82.04.050(1)(a) and not the lease-for-sublease exception. What the Manufacturers ignore is that a retail lease is included within the definition of a "retail sale." RCW 82.08.010(11); RCW 82.04.050(4)(a). Because a lease qualifies as a "sale" under RCW 82.08.010(11), a lease is extended to the sale-for-resale exception from the term "retail sale." RCW 82.04.050(1)(a)(i). Therefore, Rule 211 applies to both the sale-for-resale exception and the lease-for-sublease exception.

150 Wn. App. at 814. Thus, the same exceptions that apply to the retail sales tax also apply to the use tax "because those exemptions are embedded within the definition of 'retail sale' under RCW 82.04.050(1)." *Activate*, 150 Wn. App. at 814.

There is no dispute that the Manufacturers leased pallets from CHEP and their leases constitute a retail transaction subject to the retail sales or use tax. However, the Manufacturers claim that they are exempt from paying either the retail sales tax or the use tax on their lease transactions with CHEP (1) under RCW 82.04.050(4)(b) as a lease for sublease or (2) as a wholesale sale of nonreturnable "packing material" under Rule 115.

### III. ANALYSIS

#### A. LEASE FOR THE PURPOSE OF SUBLEASE EXCEPTION TO THE RETAIL SALES OR USE TAX

DOR assigns error to the Board's conclusion that the Manufacturers' lease of pallets from CHEP was within the "retail sale" exception of RCW 82.04.050(1)(a)(i) and (4)(b) as a lease for sublease. DOR argues that the Manufacturers' lease of the pallets from CHEP does not qualify for the exemption because the Manufacturers did not (1) sublease the pallets as they did not receive consideration from their customers for the customers' own use of the pallets or (2) acquire the pallets from CHEP for the purpose of subleasing the pallets to their customers. The Manufacturers argue that the Board correctly determined that their lease of pallets from CHEP is within the plain meaning of a lease-for-sublease exemption because it (1) "sub-transferred possession" of CHEP pallets to their customers, (2) received consideration for the pallets from their customers, and (3) used the pallets "for the purpose of shipping product to their customers." Appellant's Resp. Br. at 12-13. We agree with DOR.

12

To qualify for the lease-for-sublease exception, the Manufacturers must show that they (1) leased the pallets for sublease, (2) subleased the pallets in its regular course of business, and (3) did not make an intervening use of the pallets before sublease.[6] *See Sprint*, 174 Wn. App. at 663; RCW 82.08.010(11); RCW 82.04.050(1)(a)(i). A lease or rental is defined as "any transfer of possession or control of tangible personal property for a fixed or indeterminate term for consideration." Former RCW 82.04.040(3)(a). As the legislature does not specifically define "sublease" as used in chapter 82.04 RCW, we apply its common meaning, which may be determined by referring to a dictionary. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 154 Wn.2d 224, 239, 110 P.3d 1132 (2005). *Black's Law Dictionary* defines "sublease" as a "lease by a lessee to a third party, transferring the right to possession to some or all of the leased property for a term shorter than that of the lessee." BLACK'S LAW DICTIONARY 1724 (11th ed. 2019).

1. NO CONSIDERATION

To establish that they subleased the pallets, the Manufacturers have to show that they transferred possession or control of the pallets *for consideration*. The Manufacturers contend that they leased the pallets to their customers for consideration because the pallet costs are factored into the amounts they charge customers for their products. DOR responds that regardless of whether the Manufacturers "factored" the pallet costs into the selling price of the products sold, the amount the Manufacturers charged for the products "was *not* consideration for their customers'

---

[6] We do not interpret the meaning of "regular course of business" within the sale-for-resale exception as DOR does not argue that the Manufacturers did not sublease the pallets in its "regular course of business."

13

own possession or use of the pallets for any period of time."[7]  Reply Br. of Resp't at 12.  Therefore, the Manufacturers did not receive consideration in exchange for the possession or control of the pallets by their customers as required by the definition of a lease or rental under former RCW 82.04.040(3)(a).  We agree with DOR.

A lease is the *exchange* of consideration (1) for the right to possess or control the property (2) for a fixed or indeterminate term.  Former RCW 82.04.040(3)(a).  The Manufacturers stipulated below that they "recoup[ ]" the pallet rental costs by factoring the costs into the amount customers pay for each product.  H2O AR at 86.  H2O stated that "one of the costs of the bottled water and beverage products are the rental payments [H2O] made to CHEP, which the parties stipulated, [H2O] recouped as part of the selling price of its products."  *Id*.  Tyson submitted to the Board that its *own* pallet costs were "factored into the amounts it charges customers" for its products.  Tyson AR at 88.  "Factual stipulations generally bind the parties and the court."  *Glen Park*, 119 Wn. App. at 487.

The Manufacturers were free to recover costs, including pallet rental expenses, through the amount they charged customers for their products.  However, the Manufacturers' ability to recover *past* costs did not convert its product sale into a "sublease" of the CHEP pallets.  Each customer's consideration was not given in exchange for the customer's own right to possess or control the *CHEP pallets* in the future; rather, the consideration was given in exchange for the customer's own right to possess or control the products sold by Tyson or H2O.

---

[7] In DOR's opening brief, DOR argues that Tyson did not charge their customers for the transferred pallets.  However, in DOR's reply brief, DOR somewhat acknowledges its stipulation.

On appeal, the Manufacturers take a somewhat different stance. The Manufacturers now argue that they factored consideration into the selling price of their products for each customer's *own use* of the pallets and not just in exchange for the customer's right to possess or control the products sold by Tyson and H2O. Therefore, the Manufacturers contend that their customers paid the Manufacturers for the customers' own future use of the pallets, making the transaction a sublease.

Assuming, arguendo, that the Manufacturers' stipulations to the Board are not binding, the outcome does not change. A "sublease" is a "lease by a lessee to a third party, transferring the right to possession to some or all of the *leased property* for a term shorter than that of the lessee." BLACK'S 1724. However, once the Manufacturers transferred a pallet to a customer, the Manufacturers' own right to possess or control the pallet under the Hire Agreement with CHEP ended. Upon transfer, CHEP deducted the pallet from the quantity of pallets in the Manufacturers' possession, and the pallet became subject to the customer's Hire Agreement with CHEP. Therefore, the Manufacturers' own lease of a pallet ended upon transfer to the customer. The Manufacturers cannot sublease a pallet when they no longer lease the pallet themselves. Thus, the Manufacturers' claim that it subleased the pallets to their customers is simply not possible within the plain meaning of a sublease and the framework of their own pallet leases with CHEP.

We hold that the Manufacturers did not receive consideration in exchange for their customers' own right to possess or control the pallets within the definition of a lease or rental under former RCW 82.04.040(3)(a) because the customers gave consideration only for the right to possess the Manufacturer's products, and the Manufacturers' right to possess or control the pallets ended upon transfer to their customers under their Hire Agreement with CHEP.

15

2.     FOR A FIXED OR INDETERMINATE TERM

The Manufacturers do not argue that their alleged sublease of pallets to their customers is for a fixed or indeterminate term, a required element of a lease under former RCW 82.04.040(3)(a). Instead, the Manufacturers contend that their transaction with their customers is within the plain language of a lease because they "sub-transferred possession of [CHEP] pallets to purchasers of their products" upon delivery of their product "for consideration." Appellant's Resp. Br. at 12.

A lease or rental is defined as "any transfer of possession or control of tangible personal property for a *fixed or indeterminate term* for consideration." Former RCW 82.04.040(3)(a). Therefore, a taxable lease differs from a sale because consideration is paid in exchange for the right to possess and control the tangible personal property *for a period of time*. Former RCW 82.04.040(3)(a). Even if the Manufacturers' customers exchanged consideration for their own right to possess or control the pallets, and the Manufacturers' lease of the pallets did not terminate upon transfer of the pallets, the Manufacturers did not receive consideration for their customers' possession of the pallets for a fixed or indeterminate term. Former RCW 82.04.040(3)(a).

DOR cites to *Gandy v. State* to support its assertion that a transaction may be characterized as a lease under the tax code only if the transfer of possession or control is for a fixed or indeterminate term. 57 Wn.2d 690, 692, 359 P.2d 302 (1961); former RCW 82.04.040(3)(a). In *Gandy*, the taxpayer owned a business leasing vehicles. 57 Wn.2d at 692. The issue before the court was whether the retail sales tax attached only to the amount paid by the lessee at the execution of the lease or if the tax also attached to each lease payment when it became due. *Id.* at 695.

To determine when the retail sales tax attached to a lease, the *Gandy* court engaged in a discussion of a lease under the "Retail Sales Tax Act," ch. 82.08 RCW. *Id.* at 694. The court

reasoned that the lessee's obligation depends upon his right to possession and "[e]ach rental payment relates to a *period of possession*." *Id.* at 695 (emphasis added). The court held that the lessee must pay taxes on the selling price when the lease is executed and all rental payments because each rental payment is for his continued enjoyment and right to possess the vehicle. *Id.*

The Manufacturers pay consideration to CHEP in exchange for their own continued enjoyment and right to possess the pallets for the past fixed or indeterminate term. *Gandy*, 57 Wn.2d at 695; former RCW 82.04.040(3)(a). However, the Manufacturers' customers do not contract with or give consideration to the Manufacturers in exchange for their own "period of possession" of the pallets for a fixed or indeterminate term. *Gandy*, 57 Wn.2d at 695. As noted above, the Manufacturers do not argue, nor does the record state, that the Manufacturers' transfer of pallets to its customers was for only a fixed or indeterminate term or that the selling price related to a corresponding "period of possession." *Id.*

The Manufacturers contend that by referencing *Gandy*, DOR "attempts to distract [this] Court by reading non-existant and irrelevant requirements into the statutory language." Appellant's Resp. Br. at 12. But *Gandy* does not expand the definition of a lease under former RCW 82.04.040(3)(a). The fact that the leases at issue in *Gandy* involved a series of rental payments does not change the definition of a lease under the Retail Sales Tax Act; it changes the number of taxable events only if the transaction involves multiple payments. 57 Wn.2d at 694.

The Manufacturers do not argue that their transactions with their customers involving CHEP pallets included an exchange of pallets for a fixed or indeterminate term, an essential element of a lease. Former RCW 82.04.040(3)(a). Thus, we again agree with DOR.

17

3.      MANUFACTURERS DID NOT LEASE THE PALLETS FOR THE PURPOSE OF SUBLEASE

DOR argues that the Manufacturers do not qualify for the lease-for-sublease exception because the Manufacturers purchased the pallets for their own use in shipping operations and not for the purpose of "resale, sublease, or subrent" within the definition of RCW 82.08.010(11).  The Manufacturers argue that DOR "is wrong:  [DOR] stipulated that [the Manufacturers] acquired the pallets for the purpose of shipping product to their customers."  Appellant's Resp. Br. at 13.  We agree with DOR.

To qualify for the lease-for-sublease exception, the Manufacturers must show that they purchased the property for resale or sublease and the Manufacturers have not made *intervening use* of the purchased items.  *Sprint*, 174 Wn. App. at 663 (emphasis added).  The terms "use," "used," "using," or "put to use," with respect to tangible personal property,

> have their ordinary meaning, and mean:
>       (a) . . . the first act within this state by which the taxpayer takes or assumes dominion or control over the article of tangible personal property (as a consumer), and include installation, storage, withdrawal from storage, distribution, or any other act preparatory to subsequent actual use or consumption within this state.

RCW 82.12.010(6).

> Rule 211 explains that the retail sales tax does not apply to sales of tangible goods when

> persons who purchase the [tangible goods] solely for the purpose of renting or leasing such property. . . . However, the retail sales tax *applies* upon sales to persons who . . . intend to make some use of the property other than or in addition to renting or leasing.

WAC 458-20-211(6)(a) (emphasis added).

Here, in the Hire Agreement, CHEP made clear that the ordinary use of its pallets is for use in shipping products:  "'[c]ustomer will use Equipment *only for shipments to [customers]*,'" Tyson AR at 98; and the Manufacturers' acknowledge that they used the pallets "for the sole

18

purpose of placing their products onto the pallets and transferring possession of those product-loaded pallets via shipment." Appellant's Resp. Br. at 1. The Manufacturers stipulated that they leased the pallets from CHEP and "*only* use[d] the pallets in shipping products to their customers." Appellant's Resp. Br. at 20 (emphasis added). The Manufacturers leased the pallets for the purpose of using the pallets for their intended use—to facilitate the delivery of their products to their customers.

The crux of the Manufacturers' argument is that their use of the pallets to distribute their products to their customers is not an intervening use. However, using the pallets to transport and distribute their products to their customers plainly constitutes making use of the pallets for a purpose other than merely renting or leasing the pallets. The undisputed material facts show that the Manufacturers not only intended but made "some use of the [pallets] other than or in addition to renting or leasing." WAC 458-20-211(6)(a). They assumed dominion or control over the pallets for the sole purpose of using the pallets to facilitate transportation and distribution of their products to their customers, well within the ordinary and expected use of a pallet. RCW 82.12.010(6)(a).

The burden of showing that the terms of a tax exemption are met lies with the taxpayer. *Activate*, 150 Wn. App. at 813 (quoting *Glen Park*, 119 Wn. App. at 486). Under the facts presented, the requirements of the lease-for-sublease exemption have not been satisfied. The Manufacturers have not shown that they subleased the pallet to their customers or that they leased the pallets from CHEP for the purpose of subleasing the pallets to their customers. Accordingly, we hold that the lease transactions at issue do not qualify for the sale-for-resale exemption as a lease for sublease under RCW 82.04.050(4)(b).

B. PACKAGING MATERIALS EXCEPTION TO THE RETAIL SALES TAX

DOR contends that the Board erred in ruling that the Manufacturers' leases of pallets qualified as a lease for sublease of packing materials under Rule 115. The Manufacturers contend that their lease transactions are exempt from the retail sales tax as wholesale sales of packing material. We agree with DOR.

Under Rule 115, the sale or lease of packing materials is not subject to the retail sales tax if the buyer of the materials "sell[s] tangible personal property contained in or protected by packing materials." The retail sales tax is not imposed if the purpose of the initial sale or lease of the packing materials is for the resale or sublease of the packing materials *with* the product.

In ruling that the Manufacturers were entitled to the sale-for-resale exemption (or lease-for-sublease exception) under Rule 115, the Board concluded that the Manufacturers' leases of pallets were a lease of "'packing materials'" and the Manufacturers subleased the pallets as part of the sale of their products. H2O AR at 28. However, as discussed above, the Manufacturers' did not sublease the pallets to their customers. The Manufacturers sold the products contained only on the pallets for shipment purposes and transferred possession of only the pallets. And any interest that the Manufacturers had in the pallets terminated upon transfer of the pallets to the customer. Therefore, we hold that the Manufacturers' lease transactions are not exempt from the retail sales tax as a resale or sublease of "packing materials" under Rule 115.

## CONCLUSION

We hold that the Manufacturers' lease transactions are not entitled to the "lease-for-sublease" exception to the retail sales or use tax under RCW 82.04.050(4)(b) or as a lease or sale of "packing materials" within the meaning of Rule 115. The Manufacturers did not lease pallets

20

from CHEP for the purpose of subleasing the pallets to their customers nor did the Manufacturers sublease the pallets to their customers. We reverse the Board and affirm the superior court's decision to deny the Manufacturers' refund requests.

_____
CRUSER, J.

We concur:

_____
MAXA, C.J.

_____
LEE, J.